OPINION
{¶ 1} In this appeal, appellant, Marcus Moorer, appeals from the judgment entry of the Geauga County Juvenile Court to bindover jurisdiction to the Geauga County Court of Common Pleas, General Division. For the reasons that follow, we affirm the judgment of the juvenile court.
 {¶ 2} The following facts were presented at the preliminary hearing and amenability hearing.[1] On February 18, 2000, the fifteen-year old appellant, along with Wesley Pearson ("Wesley") and Jillian Holder ("Jillian"), made arrangements to rob a Clark gas station/convenience store in Chester Township, Ohio. Just prior to the robbery, Wesley gave a loaded handgun to appellant. Appellant and Wesley then entered the gas station, while Jillian waited outside with her car.
 {¶ 3} A few minutes after they entered the gas station, appellant, without warning, shot Danielle Kovacic ("Danielle"), a gas station employee, twice in the back. As Danielle staggered into a back room, appellant fired two shots at Rachel Cosgrove ("Rachel"), Danielle's best friend, who was visiting Danielle that evening at the gas station. Rachel also retreated to the back room.
 {¶ 4} While taking money from the cash register, Wesley instructed appellant to follow Rachel and Danielle and shoot them. Appellant proceeded to the back room where he fired another shot at Rachel who was hiding behind filing cabinets. Appellant then aimed the gun at Danielle's head and fired at close range, mortally wounding her. Before leaving the gas station, appellant again pointed the gun at Rachel's head and pulled the trigger twice. Fortunately, the gun was out of bullets and appellant fled the scene leaving Rachel with only a minor head wound from an earlier shot. Danielle, however, died as a result of two gunshot wounds to the back and the gunshot wound to her head.
 {¶ 5} On February 22, 2000, appellee, state of Ohio, filed a complaint against appellant in the Geauga County Juvenile Court. Appellant was charged with aggravated murder, attempted aggravated murder, and aggravated robbery. Appellee then filed a motion to bindover jurisdiction under R.C. 2151.26(C), to the Geauga County Court of Common Pleas, General Division, so that appellant could be tried as an adult.
 {¶ 6} In accordance with former Juv.R. 30(A), the juvenile court held a preliminary hearing on March 16, 2000. At the conclusion of the preliminary hearing, the juvenile court concluded that existing probable cause established that appellant committed the acts alleged, and that the crime would have been a felony if committed by an adult.
 {¶ 7} On May 3, 2000, an amenability hearing was held pursuant to former Juv.R. 30(C). At the amenability hearing, the parties stipulated that: (1) Danielle sustained multiple gun shot wounds during and as a result of the commission of the acts charged, resulting in her death, (2) Rachel sustained a gunshot wound to the head during the commission of and as a result of the acts charged, and (3) appellant had a firearm under his control while committing the acts charged and discharged the firearm to facilitate the commission of the acts charged.
 {¶ 8} Voluminous testimony was given during the amenability hearing regarding appellant's personal background. Included was testimony by Dr. Neuhaus, a court-appointed psychologist, who conducted appellant's mental examination prior to the amenability hearing. At the conclusion of all the testimony, the juvenile court ruled that the matter should be bound over to the Geauga County Court of Common Pleas, General Division.
 {¶ 9} In its judgment entry of May 4, 2000, the juvenile court stated:
 {¶ 10} "The Court, having reviewed the mental health examination prepared at the direction of the Court, evidence presented at the time of the hearing, and documentation submitted to the Court under seal from the Cuyahoga County Children and Family Services, Beech Brook, and PEP Program, finds that there are reasonable grounds to believe that the child [appellant] is not amendable [sic] to care or rehabilitation in any facilities designed for the care, supervision, and rehabilitation of a delinquent child. Further, there is reasonable grounds to believe that the safety of the community may require that the child [appellant] be placed under legal restraint for a period extending beyond his 21st birthday if the complaint is found to be true.
 {¶ 11} "In reaching this decision, the Court has considered all relevant factors including those provided for in Ohio Revised Code Section 2151.26(C)(2)."
 {¶ 12} Following the bindover, appellant was indicted by the Geauga County Grand Jury on charges of aggravated murder, attempted aggravated murder, and aggravated robbery, with numerous firearm specifications. On August 29, 2000, appellant entered a guilty plea to all charges. Appellant was subsequently sentenced to: (1) life imprisonment without eligibility for parole until he has served thirty years on the charge of aggravated murder, (2) ten years incarceration for attempted aggravated murder, to be served consecutively to the term imposed for the aggravated murder charge, (3) three years incarceration for the aggravated robbery charge, to be served concurrently with the aggravated murder charge, and (4) three years incarceration as to the firearm specifications, to be served consecutively to all other prison sentences.
 {¶ 13} Appellant filed a timely notice of appeal regarding the juvenile court's bindover to the Geauga County Court of Common Pleas, General Division, with the following assignment of error for our consideration:
 {¶ 14} "The juvenile court erred and abused its discretion by determining that appellant was not amenable to care or rehabilitation or further care or rehabilitation in any facility designed for the care, supervision and rehabilitation of delinquent children."
 {¶ 15} As an initial matter, we recognize that appellant's guilty plea did not waive his right to appeal the juvenile court's bindover proceedings. The juvenile court is granted exclusive subject matter jurisdiction regarding such proceedings, and "the exclusive subject matter jurisdiction of the juvenile court cannot be waived." State v.Wilson, 73 Ohio St.3d 40, 44, 1995-Ohio-217. Moreover, a bindover order from the juvenile court is not a final appealable order. In re Becker
(1974), 39 Ohio St.2d 84, 87. See, also, State ex rel. Torres v. Simmons
(1981), 68 Ohio St.2d 118, 119. Therefore, appellant's opportunity to file a notice of appeal regarding the juvenile court's bindover did not transpire until the Geauga County Court of Common Pleas, General Division, issued a final appealable order.
 {¶ 16} That being the case, appellant properly initiated the instant appeal. We will now examine the merit of appellant's assignment of error.
 {¶ 17} Under his sole assignment of error, appellant argues that the juvenile court abused its discretion when it found appellant not amenable to care or rehabilitation based solely on the gravity of the charges and need to punish. In doing so, appellant presents two specific points of contention for our review: (1) the juvenile court failed to consider the factors of both former R.C. 2151.26(C)(2)(a)-(e) and former Juv.R. 30(E); and (2) there was no competent and credible evidence presented at the amenability hearing which would allow the juvenile court to bindover jurisdiction under former R.C. 2151.26(C).
 {¶ 18} Appellant's first point of contention maintains that the juvenile court, as a matter of law, erred by failing to consider the factors of former R.C. 2151.26(C)(2) and former Juv.R. 30(E). Appellant concedes that not all of the factors listed must be resolved against the juvenile before a bindover is permitted. However, appellant argues that "the Juvenile Court's transfer of jurisdiction over Appellant was unreasonable based upon the information before the Court." Furthermore, appellant asserts that because the factors listed in former R.C.2151.26(C)(2) are non-exclusive the juvenile court was required to consider additional factors addressed in former Juv.R. 30(E). After reviewing the record before us, we find that the juvenile court properly considered the requisite factors.
 {¶ 19} Former R.C. 2151.26 and former Juv.R. 30 provide the procedures that the juvenile court was required to follow when relinquishing its exclusive subject matter jurisdiction over appellant via a bindover. State v. Holder, 11th Dist. Nos. 2001-G-2345 and 2001-G-2350, 2002-Ohio-7124, at ¶ 31. In the instant case, the applicable section is former R.C. 2151.26(C).
 {¶ 20} Former R.C. 2151.26(C)(1) allows a juvenile court to bindover a juvenile for prosecution as an adult when the following criteria exist: (1) the child was fourteen years or older at the time of the act charged; (2) there was probable cause to believe the child committed the act allegedly committed; (3) there are reasonable grounds to believe that the child was not amenable to care or rehabilitation in the juvenile system; and (4) there are reasonable grounds to believe that the safety of the community may require the juvenile to be confined beyond his 21st birthday. R.C. 2151.26(C)(1)(a)-(c).
 {¶ 21} When making the above stated determinations the juvenile court must consider the following factors set forth in former R.C.2151.26(C)(2):
 {¶ 22} "(a) A victim of the act charged was five years of age or younger ***;
 {¶ 23} "(b) A victim of the act charged sustained physical harm to the victim's person during the commission of or otherwise as a result of the act charged.
 {¶ 24} "(c) The act charged is not a violation of section R.C.2923.12 of the Revised Code, and the child is alleged to have had a firearm on or about the child's person or under the child's control while committing the act charged and to have *** used the firearm to facilitate the commission of the act charged.
 {¶ 25} "(d) The child has a history indicating a failure to be rehabilitated following one or more commitments pursuant to division (A)(3), (4), (5), (6), or (7) of section 2151.355 [2151.35.5] of the Revised Code.
 {¶ 26} "(e) A victim of the act charged was sixty-five years of age or older or permanently and totally disabled ***."
 {¶ 27} While these factors must be considered by the juvenile court, it is not necessary that all of them be answered affirmatively to properly bindover jurisdiction. See, e.g., State v. Steele (June 28, 2001), 10th Dist. No. 00AP-499, 2001 Ohio App. LEXIS 2868.
 {¶ 28} Also, when making its determination to bindover, the juvenile court must consider the following factors from former Juv.R. 30(E): (1) the child's age and mental and physical condition; (2) the child's prior juvenile record; (3) previous efforts to rehabilitate the child; (4) the child's family environment; (5) the child's school record; and (6) the specific facts of the offense for which probable cause was found. Holder at ¶ 32, citing State v. Whisenant (1998),127 Ohio App.3d 75, 90. Although the juvenile court must consider these five factors, it is not mandatory that any of these factors be resolved against the juvenile's transfer before a bindover is permitted. Holder at ¶ 32, citing State v. Douglas (1985), 20 Ohio St.3d 34, 37.
 {¶ 29} Finally, while not expressly stated in former R.C.2151.26(C)(2) or former Juv.R. 30(E), the seriousness of the alleged offense is a factor that the juvenile court may consider when determining to bindover. In State v. Watson (1989), 47 Ohio St.3d 93, 96, the Supreme Court of Ohio stated, "[t]he seriousness of the alleged act is relevant to `the assessment of the probability of rehabilitating the child within the juvenile justice system' ***." The Court reasoned that this factor assists the juvenile court in its determination of whether the juvenile can be rehabilitated prior to his or her 21st birthday and what the status of the juvenile's mental health was. Id. See, also, Steele at 14-15. In sum, the ultimate "purpose behind Juv.R. 30, and its statutory counterpart, R.C. 2151.26, is `the assessment of the probability of rehabilitating the child within the juvenile justice system.'" Watson at 95, quoting Douglas at 36.
 {¶ 30} In the instant case, the record shows that both parties stipulated to two of the factors from former R.C. 2151.26(C)(2). First, it was stipulated that Danielle and Rachel sustained physical harm to their persons during the robbery. Second, it was stipulated that appellant used a firearm to commit the robbery.
 {¶ 31} The record further demonstrated that both Danielle and Rachel were over the age of five and under the age of sixty-five at the time of the robbery. Evidence also established that neither Danielle nor Rachel were disabled, and appellant had never been committed to rehabilitation pursuant to R.C. 2151.35.5(A)(3), (4), (5), (6), or (7) prior to the offense. Although the foregoing three factors of R.C.2151.26(C)(2) were found in the negative, it was not mandatory for the juvenile court to find these factors in the affirmative to properly bindover appellant. The juvenile court needs only to consider these factors when making its determination to bindover jurisdiction.
 {¶ 32} Although the juvenile court did not expressly state its consideration of each factor at the end of the amenability hearing or in its journal entry, it was not required to do so. R.C. 2151.26(F) explains that a "juvenile court shall state the reasons for the transfer and order." (Emphasis added.) The Supreme Court of Ohio has held that while the juvenile court is required to state its reasons for the transfer, it is not required to state its findings with respect to the enumerated factors of R.C. 2151.26(C)(2). Douglas at 36. See, also, In re Smith
(Dec. 20, 1991), 6th Dist. No. L-91-090, 1991 Ohio App. LEXIS 6099, at 6-7 (holding that the juvenile court need only state the reasons for a bindover in its order of transfer). That being said, the juvenile court did not err by failing to state its consideration of each specific factor at the hearing or in its judgment entry.
 {¶ 33} While the juvenile court did not specifically propound its consideration of the enumerated factors at the hearing or in its judgment entry, the evidence presented in the record confirms that the juvenile court contemplated the factors of R.C. 2151.26(C)(2). Moreover, the juvenile court stated in its judgment entry that "the Court has considered all relevant factors including those provided for in Ohio Revised Code Section 2151.26(C)(2)." Thus, in accordance with the law, the juvenile court properly stated its reasons for the bindover and also indicated in its judgment entry that it had considered the factors listed in R.C. 2151.26(C)(2).
 {¶ 34} We also find that the juvenile court properly considered the factors listed in former Juv.R. 30(E). Similar to former R.C.2151.26(F), former Juv.R. 30(G) states that "[t]he order of transfer shall state the reasons for transfer." Accordingly, the Supreme Court of Ohio has held that the juvenile court is not required to make written findings as to the five factors of former Juv.R. 30(E). Douglas at 35. The Court explained, "as long as sufficient, credible evidence pertaining to each factor exists in the record before the court, the bindover order should not be reversed ***." Id. at 36.
 {¶ 35} In the case at bar, the juvenile court made no written findings as to its consideration of the factors of former Juv.R. 30(E). Nevertheless, as will be established in our analysis of appellant's second point of contention, the evidence presented to the juvenile court during the course of the preliminary hearing and amenability hearing confirms that the juvenile court heard sufficient, credible evidence pertaining to each factor. As a result, it is presumptive that the juvenile court considered the five factors of former Juv.R. 30(E).
 {¶ 36} Additionally, the juvenile court appropriately considered the seriousness of the offense. Evidence presented to the juvenile court revealed that appellant's actions were premeditated and occurred in a deliberate manner. The evidence failed to establish that appellant's actions were the result of a panicked response induced by a robbery gone awry. Instead, appellant, without warning, shot one of the victims twice in the back. Appellant then calmly followed the wounded victim and her friend to a back room where he proceeded to shoot the defenseless victim once in the head at close range, and attempted to fire the weapon point blank at her friend. The juvenile court properly considered the seriousness of appellant's cold-blooded actions, and appropriately used such evidence to aid in its determination to bindover appellant.
 {¶ 37} Based upon the foregoing analysis, it is clear that the juvenile court considered the relevant factors of former R.C. 2151.26(C)(2) and former Juv.R. 30(E) when making its determination to transfer jurisdiction. The first portion of appellant's assignment of error is without merit.
 {¶ 38} Appellant's second point of contention argues that the juvenile court abused its discretion by ordering the bindover despite the absence of sufficient competent and credible evidence. In support of his argument, appellant points to evidence presented during the amenability hearing demonstrating that appellant's behavior began to improve after the age of twelve due to treatment provided by the Beech Brook program and Positive Education Program ("PEP"). Appellant submits that the juvenile court ignored that he was fifteen-years old at the time of the amenability hearing and failed to state why six years of rehabilitation in a juvenile facility would not successfully rehabilitate him. Finally, appellant contends that his sentence as an adult will be detrimental to the community because of an increased likelihood of recidivism.
 {¶ 39} "[T]he juvenile court enjoys wide latitude to retain or relinquish jurisdiction, and the ultimate decision lies within its sound discretion." Watson at 95. A juvenile court's decision to bindover jurisdiction should not be reversed absent an abuse of discretion. Statev. Golphin (1998), 81 Ohio St.3d 543, 546. An abuse of discretion "connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." State v.Adams (1980), 62 Ohio St.2d 151, 157. Thus, the relevant issue on appeal is not whether we would have reached the same result as the juvenile court, but whether the juvenile court abused its discretion. State v.Hopfer (1996), 112 Ohio App.3d 521, 535.
 {¶ 40} During the amenability hearing, Mrs. Moorer, appellant's former adoptive mother, gave testimony describing various behavioral problems exhibited by appellant from the time he began residing with the Moorer family at age two, until he left at age thirteen. These problems included public urination, property damage, and one instance in which appellant attempted to poison Mrs. Moorer. There was also evidence that appellant had similar behavioral problems in childcare and school situations during that same time frame. Mrs. Moorer speculated that appellant's behavioral problems were due to possible abuse as an infant prior to his adoption, and the county's unwillingness to provide her with various resources to help control his behavior.
 {¶ 41} Because appellant had become a safety concern to his adoptive parents, they requested his removal. Thus, from the ages of ten to thirteen appellant was enrolled in the Beech Brook residence program to help control his behavior. Beech Brook is a multi-service treatment and residential center that is designed for the prevention and treatment of emotional disturbances in families and children. Appellant was part of the residence program at Beech Brook and, by definition, was an emotionally disturbed youngster. Testimony from various professionals of the Beech Brook program demonstrated that, although appellant required disciplinary action at times, generally he was a typical resident in that situation. At age thirteen appellant was required to leave the Beech Brook program because he was no longer eligible for residential treatment. As a result, appellant was returned to the Moorer family, with hopes of resuming the adoptive process.
 {¶ 42} Shortly after returning to live with the Moorers, appellant broke out a window of the family's automobile. Mrs. Moorer testified that she felt appellant had become too difficult for her to control and that he needed further residential treatment. Consequently, the Moorers rescinded appellant's adoption around March 1998, when appellant was still thirteen years old, in the hopes that he would be placed in an environment more suited to assisting in the control of his behavior.
 {¶ 43} Appellant was then placed into the foster care of the Elstons. During the amenability hearing, testimony was given by Mr. Elston. On direct-examination, Mr. Elston testified that during appellant's stay at the foster home, appellant's behavior had shown some signs of improvement. For instance, while living with the Elstons, appellant was enrolled in PEP and at times displayed a willingness to improve his behavioral problems.[2] Again, testimony from various professionals of PEP confirmed that aside from occasional disciplinary problems appellant was a typical enrollee.
 {¶ 44} Nevertheless, Mr. Elston's cross-examination testimony revealed that as appellant became older his behavior became more criminal in nature. While living with the Elstons, appellant continuously broke curfew, began smoking marijuana, stole money from a McDonald's, stole and used Mrs. Elston's credit card without her permission, stole the gun that was used in the robbery and murder, robbed the Clark gas station, shot and injured Rachel, and murdered Danielle.
 {¶ 45} A psychological evaluation of appellant determined that he was a troubled youth who was unable to control his own actions. Dr. Neuhaus, after a full mental examination of appellant, testified that he believed appellant would not be amenable to rehabilitation in the juvenile system. At the amenability hearing, Dr. Neuhaus stated that appellant had difficulty in anticipating the consequences of his actions, exhibited aggressive and violent tendencies, and only showed signs of remorse for his actions when caught. Often appellant would gain and then exploit the trust of the caretakers surrounding him.
 {¶ 46} Dr. Neuhaus also testified that any behavioral improvements demonstrated by appellant during his time with the Elstons, Beech Brook, and PEP were superficial. It was the opinion of Dr. Neuhaus that appellant failed to internalize the treatment that he received so that it could be properly utilized when necessary.
 {¶ 47} Dr. Neuhaus further explained that within a controlled environment appellant could restrain his actions in order to conform to the established rules and standards. However, Dr. Neuhaus found that outside of a controlled environment appellant was unable to restrain his behavior and was a danger to himself and the community. Dr. Neuhaus attributed appellant's inability to control his actions outside of a controlled environment to a lack of "internal brakes." Generally, Dr. Neuhaus explained that appellant was unable to comprehend the consequences of his actions and, therefore, acted impulsively with no regard for the dangers that he was creating. Dr. Neuhaus also described appellant as possessing the ability to feign sincere regret and sorrow for his wrongdoings. Ultimately, Dr. Neuhaus testified that despite all the years of effort by various trained professionals, appellant still had many behavioral difficulties. In his written report, Dr. Neuhaus made the following conclusion:
 {¶ 48} "While Marcus [appellant] has had quite significant levels of treatment services, significant questions exist about the degree to which he has been able to internalize, generalize, and basically, consistently act upon or utilize the gains he was making in treatment and the skills that he was trying to develop as a result of the considerable biopsychosocial efforts that have been made on his behalf. Consequently, I would be quite pressed to identify any additional services that might potentially and objectively be made available to Marcus [appellant]."
 {¶ 49} At the conclusion of the amenability hearing, the juvenile court stated appellant was a troubled youth that had a history of behavioral problems that were at least partially explained by the various traumas of his life. The juvenile court then explained that any signs of improvement in appellant's behavior were superficial at best. Furthermore, "the need to protect the public would prevent the Court from coming anywhere close to providing Marcus [appellant] with the services that he's already received." Consequently, the juvenile court found that appellant was "not amenable for rehabilitation in the juvenile justice system" and that there were reasonable grounds to believe that appellant would "need to be detained beyond his 21st birthday in order to protect the safety of the public."
 {¶ 50} Certainly, there was some evidence presented at the amenability hearing that, in limited areas, appellant demonstrated some amenability to rehabilitation within the juvenile system. For example, PEP employees and the Elstons testified that appellant had shown that he seemed to be willing and able to develop solid relationships with the people around him. Beech Brook's records established that appellant had surprisingly few incidents where excessive discipline was necessary. During his residence with the Elstons, appellant appeared to be taking some positive steps toward reunification with his adoptive parents. Furthermore, appellant was working toward his enrollment at West Geauga High School by the fall of 2000.
 {¶ 51} Despite these findings, there was abundant competent and credible evidence which demonstrated that appellant would not be amenable to rehabilitation. As stated previously, evidence at the amenability hearing established that appellant was manipulative and exploited the trust of those who cared for him. There was evidence that even in the restricted setting of his foster home the criminal nature of his behavior was escalating. The psychological evaluation of Dr. Neuhaus concluded that any behavioral improvements displayed by appellant were superficial.
 {¶ 52} Furthermore, while appellant appeared to be able to function in a tightly structured environment, when he was allowed to exercise any discretion outside of this structured environment he made destructive and even deadly choices. Despite his avowed respect and affection for his foster parents, and his desire to return to his adoptive parents, he willingly participated in the calculated cold-blooded incident at issue. Such actions further corroborated the psychological analysis and conclusions of Dr. Neuhaus. Certainly there was abundant evidence that appellant was not amenable to rehabilitation as a juvenile and the safety of the community required appellant to be detained beyond the age of 21.
 {¶ 53} As set forth above, the juvenile court evaluated a multitude of relevant evidential sources, including appellant's personal background and psychological evaluation. The juvenile court's decision to bindover jurisdiction was not made unreasonbly, arbitrarily, or unconscionably, as there was abundant competent and credible evidence before the juvenile court. Therefore, the juvenile court did not abuse its discretion by its bindover of appellant. This portion of appellant's assignment of error is not well-taken.
 {¶ 54} Based upon the foregoing analysis it is clear that the juvenile court considered all relevant factors and did not abuse its discretion by issuing a bindover of appellant to the Geauga County Court of Common Pleas, General Division. Appellant's assignment of error is without merit, and the judgment of the juvenile court is affirmed.
Judgment affirmed.
WILLIAM M. O'NEILL and CYNTHIA WESTCOTT RICE, JJ., concur.
[1] Although additional facts became available during subsequent proceedings, we are confined to only those facts that were available to the juvenile court during the proceeding at issue.
[2] PEP provides educational and mental health services for students who need a more restrictive and structured setting than their public school was able to provide.